# EXHIBIT A

DECLARATION OF MARK BROOKS

I, Mark Brooks, declare as follows:

1. I have been employed as a Police Officer with the Los Angeles Police Department ("LAPD") since November 1988. During my career, I have served as an undercover narcotics officer for approximately 18 months. Between 1992 and 2004, I was assigned to the LAPD's Newton Division. Between 1999 and 2004, I was a Senior Lead Officer within Newton Division. As a Senior Lead Officer, I served as a liaison between the community and the LAPD and concentrated on crime reduction. I also patrolled my area eight to ten hours a day, five days per week. During my tenure at the Newton Division, I played an active role in narcotics investigations. I have testified several hundred times as an expert witness regarding crack cocaine trafficking, hand-to-hand narcotics sales, and street vernacular.

2. This affidavit is made in connection with sentencing hearings for defendants Charlotte Venia Jackson ("Jackson"), John D. Edwards, Jr. ("Edwards"), and Juan Emanuel Lococo ("Lococo") in cases CR 03-687-RGK and CR 03-689-RGK. I am very familiar with the investigation of defendants Jackson, Edwards, Lococo, and the other defendants charged in these cases because their criminal activity took place with the LAPD's Newton Division, and I actively participated in the investigation. Given the limited purpose of this affidavit, however, I have not set forth all of my knowledge of or investigation into these cases.

3. Due to my assignments in LAPD's Newton Division, I have known many of the defendants in these cases, including Jackson, for several years. I saw these defendants on an almost daily



MB

basis and talked with them on numerous occasions. Additionally, I played an active role in the wiretap investigation in this case and have personally reviewed many of the calls intercepted in these cases. I have also had the opportunity to personally speak with defendants Jackson, Edwards, and Lococo in person on several occasions. Consequently, I am familiar with and can identify their voices.

4. Attached to this affidavit as Exhibit A are true and correct copies of transcripts of telephone calls intercepted in this case. I reviewed each transcript and listened to the corresponding telephone call. Based on my familiarity with the defendants, I recognize the voices in the calls and believe that the attached transcripts accurately reflect the identities of the listed speakers, and the content of the calls. In the paragraphs that follow I have provided my interpretation and explanation of the conversations reflected in the attached transcripts. In each instance, I have based the interpretation on my training, experience, knowledge of this investigation, and knowledge of these defendants. I have also provided information based on my knowledge of other events that took place during the course of this investigation.

Case No. CR 03-689-RGK

5. On October 30, 2002, as reflected in calls 1-103 and 1-106, Jackson purchased a "bird" and received a "cookie" from Lococo. A "bird" is slang for one kilogram of powder cocaine and a "cookie" is slang for one ounce of crack cocaine. During call 1-103, Jackson told Edwards that Lococo was "cookin' it," which I believe means that Lococo was converting powder cocaine into



MP

crack cocaine himself. That same day, Jackson delivered the "bird" and one-half the "cookie" to Edwards. On October 30, 2002, after these calls took place, officers of the Redondo Beach Police Department executed a state search warrant at Edwards' apartment and recovered 993 grams of powder cocaine, 179 grams of crack cocaine, and approximately $14,000 in U.S. currency. Subsequent fingerprint analysis of the kilogram of powder cocaine found Lococo's fingerprints on the wrapping materials. The crack cocaine found at Edwards' residence consisted of 165.5 grams in seven bags and one bag containing 13.5 grams. I believe that Lococo provided Jackson with a cookie in order to show her and Edwards what his powder cocaine would look like when it was cooked into crack cocaine. I also believe that the bag containing 13.5 grams of crack cocaine seized at Edwards' residence was one-half of the cookie Lococo provided to Jackson.

6. On November 8, 2002, as reflected in calls 1-107 and 1-108, Jackson spoke with co-defendant Brian Favors about selling him a "seven" for $135. Jackson also stated that "Juju" had a "seven." A "seven" is seven grams of crack cocaine, for which $135 is the typical price. I know "Juju" to be a reference to the minor identified in the indictments as "J.W." I have known J.W. since he was 15 years old, had numerous encounters with him, and know that he was a minor at the time of crimes in this case. I am not aware of anybody else in the neighborhood known as Juju. Based on this and other intercepted calls, I believe that Jackson was using J.W. to sell crack cocaine.

7. On November 10, 2002, as reflected in calls 1-109, 1-110, 1-111, and 1-112, Jackson negotiated the purchase of one

kilogram of powder cocaine from Lococo at Edwards' request. That day, Edwards told Jackson that he would pay $14,500 for one kilogram of cocaine. I know that $14,500 is consistent with the market price at that time for one kilogram of powder cocaine.

8. On November 26 and 27, 2002, as reflected in calls 1-120 and 1-121, Jackson agreed to supply co-defendant Roosevelt Sawyer with "another one." "Another one" is a reference to seven grams of crack cocaine.

9. On December 3, 2002, as reflected in calls 1-123, 1-124, and 1-125, Jackson sold a "bird" to a cooperating source for $14,700, and provided the cooperating source with a small piece of crack cocaine in order to show the source how the powder would cook into crack cocaine. Jackson obtained the "bird" from Lococo the same day and gave it to the cooperating source. Laboratory analysis revealed that Jackson provided the source with 991.5 grams of powder cocaine and .13 grams of crack cocaine.

10. On December 4, 2002, as reflected in call 1-126, Jackson supplied co-defendant Andre Johnson with two "packs." A "pack" is a reference to seven grams of crack cocaine. Later that day, Johnson was arrested, and at that time possessed 4.6 grams of crack cocaine, which I believe was part of the crack cocaine supplied to him by Jackson.

11. On December 4, 2002, as reflected in call 1-127, Jackson told co-defendant Sawyer that she was on her way to pick up two "packs" from co-defendant Johnson. Jackson also said that she would come and see Sawyer once she was "through doing [her] little rounds." I believe that when Jackson stated she was doing her "little rounds" she was referring to checking in with the

 mb

individuals that were selling narcotics on her behalf to collect narcotics proceeds or determine whether they needed more narcotics to sell. I further believe that this call, among others, demonstrates that Jackson was overseeing the activities of multiple individuals selling narcotics on her behalf.

12. On December 9, 2002, as reflected in call 1-136, Jackson said that she could not leave the house because she had "no workers on 56th and there customers is comin'." I know that Jackson distributed crack cocaine to several individuals in order for them to sell it, including co-defendants Jefferson, Favors, Grant, Johnson, and Sawyer. I believe this call demonstrates the fact that Jackson was reluctant to leave her house until she re-supplied her dealers on 56th street with crack cocaine.

13. On December 12, 2002, as reflected in call 1-138, Jackson asked co-defendant Sawyer if he had the money ready for the sale of "two packs" and asked if "both of them" were ready. "Both of them" refers to the proceeds from two seven-gram packs of crack cocaine.

14. On January 1, 2003, as reflected in call 1-142, Jackson gave J.W. $50 worth of crack cocaine to sell. Edwards also gave J.W. "one" to sell. "One" is a reference to one pack, which is seven grams of crack cocaine.

15. On January 24, 2003, as reflected in call 1-147, Jackson told Edwards that she had "ten ready" and also told him to get "eight ready." When Jackson told Edwards that she had "ten ready" she was saying that she had the money from the prior sale of 10 packs (70 grams) of crack cocaine. By telling Edwards to get "eight ready," Jackson was saying that she needed eight

 mb

more packs (56 grams) of crack cocaine from Edwards.

16. On January 22, 2003, as reflected in call 1-150, Jackson told co-defendant Jefferson that she was on her way to meet him in order to collect a narcotics payment, and she advised Jefferson that she would "get [him] some more," which I believe was a reference to providing him with more crack cocaine. Later that day, law enforcement seized 20.98 grams of crack cocaine from Jefferson, which I believe was supplied by Jackson.

17. On February 8, 2003, as reflected in call 1-153, Jackson told co-defendant Favors that she needed the "135," which was the market price for seven grams of crack cocaine.

18. On February 20, 2003, as reflected in call 1-155, Jackson told co-defendant Johnson that he owed Jackson "85" because he only gave her "50." Since $135 was the price for seven grams of crack cocaine, Jackson was telling Johnson that he owed her $85 dollars for a prior sale of seven grams of crack cocaine.

19. On March 14, 2003, law enforcement seized 3.24 grams of crack cocaine from Jefferson. On March 15, 2003, as reflected in call 1-156, Jackson told Edwards that she had supplied Jefferson with "two packs." Therefore, I believe that Jackson supplied Jefferson with the crack cocaine that was seized from him on March 14, 2003.

20. On April 9, 2003, as reflected in call 1-167, co-defendant Tawana Edwards asked Edwards to get her "eight of them." "Eight of them" is a reference to eight quarter-ounce packages of crack cocaine (56 grams). Later that day, Tawana Edwards sold what subsequent laboratory analysis determined to be

 MD

53.5 grams of crack cocaine to a cooperating source.

21. On June 26, 2003, law enforcement seized approximately 53 grams of crack cocaine from Jackson's residence.

22. On June 26, 2003, law enforcement seized approximately 611.73 grams of crack cocaine from Edwards' residence.

23. On June 26, 2003, law enforcement seized approximately 5,247.5 grams of powder cocaine and 64.3 grams of crack cocaine from Lococo's distribution location.

Case No. CR 03-687-RGK

24. On November 1, 2002, as reflected in call 2-215, Jackson told an unknown female that she "just got [her] stuff cooked" and had "to go drop it off to [her] workers." I believe that Jackson was stating that she had just received powder cocaine that had been cooked into crack cocaine, and that she intended to resupply the individuals that were selling narcotics on her behalf with additional crack cocaine. I further believe that this call, among others, demonstrates that Jackson was overseeing the activities of multiple individuals selling narcotics on her behalf.

25. On December 7, 2002, as reflected in call 2-218, Jackson got a "little one" from Lococo. A "little one" is a reference to four and one-half ounces (126 grams) of powder cocaine.

26. On December 7, 2002, as reflected in call 2-221, co-defendant Anthony Deal gave Jackson "12 packs." Since a "pack" is seven grams of crack cocaine, 12 packs equals 84 grams of crack cocaine.

27. On December 26, 2002, as reflected in call 2-224,

 mb

Jackson told co-defendant Deborah Wimberly that she (Jackson) "gave the last one to Bat this morning" and her "workers got some work on 56th." I believe that Jackson was stating that she had given her last quantity of crack cocaine to co-defendant Deal (also known as "Bat") that morning, but that the individuals that were selling narcotics on her behalf on 56th Street had a supply of crack cocaine. I further believe that this call, among others, demonstrates that Jackson was overseeing the activities of multiple individuals selling narcotics on her behalf.

28. On December 31, 2002, as reflected in calls 2-227, 2-228, 2-229, 2-232, 2-233, 2-234, and 2-235, Jackson purchased powder cocaine from Lococo. Jackson then took the powder cocaine to co-defendant Deal in order for him to convert it into crack cocaine. Afterward, Deal gave Jackson crack cocaine to sell. Jackson later told Deal that she got the "stuff" and there was "nine in there." Jackson's references to the "stuff" and "nine in there" was a confirmation that she had picked up crack cocaine that amounted to nine packs (63 grams) of crack cocaine.

29. On January 9, 2003, as reflected in calls 2-237, 2-238, 2-239, and 2-240, Jackson purchased four and one-half ounces (126 grams) of powder cocaine from Lococo. Jackson then gave the powder cocaine to Deal in order for him to convert it into crack cocaine.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 1st day of July 2005, at Los Angeles, California.

[signature]

MARK BROOKS

EXHIBIT 3

CALL 1-103

166E-LA-228163
DATE: 10-30-2002
TIME: 15:30
TAPE #: 7
CDCA #: 861
REVIEWED BY: ROBERT E. KING REK

---

CHARLOTTE JACKSON "TINA JACKSON" = CJ
JOHN D. EDWARDS JR. "JUNIOR" = JE
UNINTELLIGIBLE = (UNI)

MUSIC PLAYING IN BACKGROUND

JE - HEY.

CJ - HEY. I'M ON MY WAY TO YOUR HOUSE. I'M ON LA BREA.

JE - SO...UM...HE GAVE US SOME EXTRA ONES?

CJ - HUH?

JE - HE GIVE US SOME EXTRA? DIDN'T EVEN ASK HIM, HUH?

CJ - I WAS...HUH?

JE - WHY YOU DIDN'T ASK HIM FOR NO EXTRA ONE?

CJ - I DID!

JE - (LAUGHING) WHAT HE SAY?

CJ - HE GOT ME TWENTY EXTRA.

JE - I'M TALKIN' ABOUT SOME...UH...FOR, UM...SOME OF THE OTHER STUFF, TOO.

CJ - OH, HE GAVE...HE COOKED A COOKIE. HE GAVE ME A COOKIE. HE WAS JUST COOKIN' IT.

JE - (COUGHS) ALRIGHT, LET ME HAVE HALF OF THAT COOKIE.

CJ - HUH?

JE - LET ME HAVE HALF THAT COOKIE OR SOMETHIN'.

CJ - HUH?

JE - I SAID LET ME HAVE HALF OF THAT COOKIE.

CJ - ALRIGHT.

JE - TINA, I'M...TINA. KNOW SOMETHIN'?

CJ - WHAT?

JE - I'M RIGHT HERE NOW, PULLIN' UP...PULLIN' UP AT THE HOUSE.

CJ - ALRIGHT. I'M RIGHT BEHIND YOU.

JE - LATE.

CJ - ALRIGHT.

END OF CALL.

EXHIBIT 4

CALL 1-104

---

166E-LA-228163
DATE: 10-31-2002
TIME: 11:43
TAPE #: 8
CDCA #: 861
RK/AS
REVIEWED BY: ROBERT E. KING REK

---

CHARLOTTE JACKSON "TINA JACKSON" = CJ
TAWANA EDWARDS = TE
UNINTELLIGIBLE = (UNI)

CJ: DID YOU GET THAT STUFF I GOT HIM YESTERDAY?

TE: GIRL, THEY TOOK ALL HIS...THEY TOOK ALL THAT!

CJ: THEY GOT...?

TE: I MEAN, I DONT KNOW WHERE THAT'S AT. I DON'T KNOW WHERE THAT'S AT.

EXHIBIT 6

CALL 1-106

166E-LA-228163
DATE: 11-3-2002
TIME: 19:46
TAPE #: 14
CDCA #: 861
REVIEWED BY: SA ROBERT E. KING

---

CHARLOTTE JACKSON "TINA JACKSON" = CJ
TAWANA EDWARDS = TE
UNINTELLIGIBLE = (UNT)

CJ: AN, YEAH THAT'S MY, UM, MY CAST OFF OF THE TIRES BEFORE THEY PUT THE RIMS ON IT. UM, YEAH. HE TOLD ME EVERYTHING, TAWANA. I JUST SEEN HIM.

TE: HE LOOK WORRIED?

CJ: AH NAW, I JUST DONT LIKE TO SEE HIM IN HERE.

TE: OH.

CJ: I DONT LIKE TO SEE NOBODY UP IN BEHIND THAT MOTHER FUCKER THERE. YEAH AND HE TOLD ME EVERYTHING THEY GOT OUT THE HOUSE AND I MEAN OUTSIDE THE HOUSE.

TE: HOW MUCH MONEY DID THEY GET?

CJ: HUH? SHIT, ABOUT WHAT FOURTEEN THOUSAND.

TE: FOURTEEN THOUSAND DOLLARS?

CJ: HELL YEAH.

TE: OH.

CJ: IT WAS IN THE CLOSET. THAT WAS OFF ONE OF THE BIRDS, REMEMBER. I HAD JUST BOUGHT A BIRD, THEY FOUND A WHOLE BIRD AND WHAT WAS LEFT OFF OF THE OTHER BIRD, OUTSIDE THOUGH.

TE: THEY NOT GONNA GIVE HIM HIS MONEY BACK?

CJ: AH HELL. HE MIGHT NOT GET THAT MONEY BACK. NAW. NAW. NOT IF HE CLAIMING IT AND IT WAS IN THE SAME SPOT. HE AIN'T GONE CLAIM THAT MONEY. FUCK THAT MONEY. HE CAN ALWAYS GET THAT MONEY BACK. SHIT.

TE: HOW MUCH MONEY YOU GOT?

CJ: WHAT?

TE: (UNI)

CJ: WHAT YOU SAY?

TE: I SAID HOW MUCH MONEY YOU GOT?

CJ: I AIN'T GOT A DIME. I'M STARTING ALL OVER AGAIN.

TE: ME TOO.

CJ: I AINT LYING. I'M STARTING ALL OVER AGAIN.

TE: UM.

CJ: BUT I'M ALRIGHT THOUGH.

EXHIBIT 9

CALL 1-109

166E-LA-228163
DATE: 11-10-2002
TIME: 13:30
TAPE #: 22
CDCA #: 861
REVIEWED BY: ROBERT E. KING

CHARLOTTE JACKSON "TINA JACKSON" = CJ
JOHN D EDWARDS JR. "JUNIOR" = JR
UNINTELLIGIBLE = (UNT)

RINGING

JR: WHAT'S UP MAN?

CJ: YEAH. WHERE THE FUCK YOU BEEN AT? WHY YOU DON'T CALL NOBODY BACK?

JR: I AIN'T HAVE NO PHONE.

CJ: I KNOW YOU HAD GOT MY MESSAGE. I CALLED YOUR HOUSE AND LEFT MESSAGES ALL ON YOUR PHONE.

JR: I AIN'T EVEN CHECK THE MOTHER FUCKING SERVICE.

CJ: OH WELL. YOU NEED TO.

JR: AHHH MAN. I SURE DIDN'T. WHAT YOU DOING?

CJ: I'M AT THE NAIL SHOP GETTING MY NAILS FILLED.

JR: WHAT? YOU NEED TO SEE WHAT'S HAPPENING WIT A BIG MAN.

CJ: UHHH HUHH.

JR: WHAT COLOR?

CJ: UMMM IT'S LIKE A WHITE. IT'S AHHH AHHH A BEIGE WHITE.

JR: WELL, YOU. UMMM. WELL YOU TELL THE MOTHER FUCKER THE SITUATION, AND WHAT, WHAT'S THE BEST DEAL.

CJ: FOR?

JR: AHH THE SAME THING.

CJ: ALRIGHT.

JR: ALRIGHT.

CJ: OK.

JR: CALL ME BACK.

CJ: ALRIGHT.

JR: ALRIGHT.

***END OF CALL***

EXHIBIT 10

CALL 1-110

166E-LA-228163
DATE: 11-10-2002
TIME: 13:33 (1)
TAPE #: 22
CDCA #: 861
REVIEWED BY: ROBERT E. KING

---

CHARLOTTE JACKSON "TINA JACKSON" = CJ
JUAN EMANUEL LOCOCO "BIG MAN" = BM
UNINTELLIGIBLE = (UNT)

RINGING

BM: HELLO.

CJ: HEY. WHAT'S UP BIG MAN?

BM: WHAT'S GOING ON?

CJ: THIS TINA.

BM: HEY. WHAT'S HAPPENING?

CJ: WHAT'S UP. HEY, YOU KNOW WHAT I TOLD YOU ABOUT MY FOLKS, RIGHT?

BM: UMM HMMM.

CJ: ALRIGHT. HE WANT ANOTHER ONE. HE SAID COULD YOU GIVE HIM A DEAL? HELLO?

BM: YEAH.

CJ: YEAH. YOU WANT ME TO COME OVER THERE AND TALK TO YOU?

BM: THAT'S ABOUT THE ONLY THING I CAN DO THOUGH.

CJ: OH, THAT RIGHT LIKE THAT?

BM: YEAH. CAUSE I'M ONLY DOING IT YOU KNOW, HE'S FREE?

CJ: HUH?

BM: HE'S FREE?

CJ: YEAH. HE'S STRAIGHT. BUT HE KINDA. YOU KNOW WHAT I'M SAYING.

BM: YEAH.

CJ: HIS BAIL AND ALL THAT, HE JUST TRYING TO GET BACK ON HIS FEET.

BM: BUT THAT'S THE BEST I CAN DO CAUSE I'M DOING THE BEST FOR HIM YOU KNOW.

CJ: OH. OK. WHAT WAS THAT UNT?

BM: IT'S FORTY SIX, RIGHT?

CJ: HUH?

BM: FORTY SIX.

CJ: NO. YOU GAVE HIM FOURTEEN FIVE REMEMBER?

BM: WELL THAT'S ABOUT THE LOW, THAT'S THE..

CJ: YOU CAN'T DO IT NO FOURTEEN FOUR?

BM: UTTT UHHH UNT. I GOT TO GIVE YOU YOUR THING TOO. BASICALLY THAT'S WHAT I'M DOING RIGHT NOW YOU KNOW. WHAT I'M SAYING.

CJ: YEAH. I FEEL YOU. ALRIGHT. I'M A CALL HIM AND TELL HIM THAT (UNT) YOU DOING IT THE LOWEST.

BM: YEAH.

CJ: THEN I'M A CALL YOU BACK.

BM: OK.

CJ: ALRIGHT.

***END OF CALL***

EXHIBIT 11

CALL 1-111

166E-LA-228163
DATE: 11-10-2002
TIME: 13:33 (2)
TAPE #: 22
CDCA #: 861
REVIEWED BY: ROBERT E. KING

---

CHARLOTTE JACKSON "TINA JACKSON" = CJ
JOHN D EDWARDS JR. "JUNIOR" = JR
UNINTELLIGIBLE = (UNT)

RINGING

JR: HEY.

CJ: HEY. I TOLD HIM ABOUT YOU AND HE SAY THAT'S THE LOWEST HE CAN GO.

JR: WHAT? WHAT HE SAY?

CJ: FOURTEEN FIVE.

JR: HUH?

CJ: IT WAS FOURTEEN FIVE.

JR: ALRIGHT. WHAT UMMM, I'M WAITING ON TAWANA. WHEN SHE COME BACK I'M A HIT YOU.

CJ: ALRIGHT. PAGE ME.

JR: HUH.

CJ: PAGE ME.

JR: I UNT UMM HAVE MY MONEY ON YOU MAN.

CJ: ALRIGHT. I'M FIXING TO PUT IT IN MY POCKET RIGHT NOW. IT'S NINE HUNDRED. I HAD TO BORROW A HUNDRED.

JR: I DON'T CARE.

CJ: ALRIGHT.

JR: ALRIGHT.

CJ: BYE.

***<u>END OF CALL</u>***

EXHIBIT 12

CALL 1-112

166E-LA-228163
DATE: 11-10-2002
TIME: 13:34
TAPE #: 22
CDCA #: 861
REVIEWED BY: SA ROBERT E. KING

---

CHARLOTTE JACKSON "TINA JACKSON" = CJ
JUAN EMANUEL LOCOCO "BIG MAN" = BM
UNINTELLIGIBLE = (UNT)

RINGING

BM: HELLO.

CJ: BIG MAN?

BM: YEAH.

CJ: HEY. SOON AS MY DAUGHTER.

BM: YEAH.

CJ: HEY. LOOK. LISTEN. SOON AS MY DAUGHTER GET BACK FROM RIALTO, SHE BEEN LEFT SINCE LIKE ELEVEN O'CLOCK.

BM: UMM HMM.

CJ: HE'LL BE READY.

BM: OK.

CJ: ALRIGHT.

BM: ALRIGHT.

CJ: TODAY THOUGH FOR SURE.

BM: OK.

CJ: ALRIGHT.

***END OF CALL***